UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL CASE NO: |
| JASON BRADLEY PATTERSON, | 4:24-cr-00002-WMR |
| Defendant. | |

**ORDER**

This matter comes before the Court on the Magistrate's Non-Final Report and Recommendation ("R&R") [Doc. 29], which recommends Defendant Jason Bradley Patterson's Motion to Suppress Tangible Evidence and Statements [Doc. 15] be denied. Defendant has filed objections to the R&R. Upon consideration of all appropriate matters of record, the Court overrules the objections and adopts the findings and conclusions of the R&R as the Order of the Court.

**I.      FACTUAL BACKGROUND**

Edward Leon is a corporal with the Bartow-Cartersville Drug Task Force. [Doc. 25 at 4]. In 2019, Corporal Leon began an investigation into Patterson after a confidential informant identified him as a heroin seller. [*Id.* at 6]. With the help of a confidential informant, the Bartow-Cartersville Drug Task Force set up two

1

controlled purchases of heroin from Patterson on September 17 and September 23 of 2019. [*Id.* at 7-9].

Based on the two controlled purchases, law enforcement obtained a search warrant for Patterson's residence and an arrest warrant for Patterson dated October 1, 2019. [Doc. 25 at 9-10; Doc. 22-1 (arrest warrant); Doc. 22-2 (search warrant)]. The same day, officers executed the search warrant of Patterson's home, but Patterson was not found at his residence. [Doc. 25 at 9-10.]. Following the search, law enforcement continued to look for Patterson. [*Id.* at 15]. On October 3, 2019, law enforcement pulled over a truck registered in Patterson's name, and the driver, a friend of Patterson, told officers that Patterson was at the driver's house located at 7 Terry Lane. [*Id.* at 16].

When officers arrived at 7 Terry Lane, the owner of the house told officers that Patterson was in the back bedroom of the house and gave officers permission to enter the home. [Doc. 25 at 16-17]. Officers went to the room, but the door was locked. [*Id.*]. When no one answered the door, officers forced open the door and found Patterson in the room. [*Id.*]. Officers saw drug paraphernalia in plain view and arrested Patterson. [*Id.* at 18]. Officers placed Patterson in handcuffs because he was under arrest pursuant to the arrest warrant. [*Id.* at 19].

Following his arrest, Corporal Leon interviewed Patterson in the back bedroom of 7 Terry Lane where the police had found and arrested Patterson. [Doc. 25 at 19; Gov't Ex. 2 (video of interview)]. Corporal Leon began by reading Patterson his *Miranda* warnings off a written card. [Gov't Ex. 2 at 0:01-0:20; *see also* Doc. 25 at 19]. Mr. Patterson acknowledged that he understood his rights by nodding his head. [Gov't Ex. 2 at 0:01-0:20; *see also* Doc. 25 at 19-20]. Patterson also signed a document waiving his *Miranda* rights. [Doc. 25 at 20].

When Corporal Leon asked Patterson if he wanted to answer questions, Patterson asked, "May I ask questions too?" [Gov't Ex. 2 at 0:30-0:55; *see also* Doc. 25 at 19-20]. Corporal Leon said that he could but reminded Patterson that the officer was not the one in custody. [Gov't Ex. 2 at 0:30-0:55; *see also* Doc. 25 at 19-20]. Patterson said he did not want to disrespect Corporal Leon but did not know what was going on. [Gov't Ex. 2 at 0:55-0:59]. Corporal Leon then explained to Patterson that he was in handcuffs because of the multiple warrants for the sale of heroin and told Patterson that law enforcement had raided his mobile home. [*Id.* at 0:59-1:08]. Patterson responded, "Right, the guy that was there was, I guess, doing that." [*Id.* at 1:08-1:13]. Corporal Leon explained that he was not going to waste time with Patterson if he was going to play ignorant or lie; informed him that the Task Force had video recordings of him selling heroin to his agent; and told Patterson he could only help him with his case if he cooperated and told the truth. [*Id.* at 1:13-1:57].

3

Patterson indicated that he was scared, but Corporal Leon said, "I'm five-foot-five, I'm not really scary." Patterson laughed and said, "You're scary." [*Id.* at 2:00-2:08; *see also* Doc. 25 at 23-24, 68]. After about a minute of silence, Corporal Leon said, "I know for a fact you're selling heroin. Do you have any heroin in this house?" Patterson shook his head in the negative. [Gov't Ex. 2 at 2:54-3:00]. Corporal Leon asked, "All you have is needles?" and Patterson nodded. [*Id.* at 3:01-3:04]. Patterson reaffirmed, "There's nothing in this house." [*Id.* at 3:04-3:20]. Corporal Leon asked if there was anything in his truck, and Patterson said, "No." [*Id.* at 3:20-3:22].

Throughout the remaining ten minutes of the interview, Patterson provided verbal or physical responses to all Corporal Leon's questions. [Gov't Ex. 2 at 3:22-13:22]. Patterson told Corporal Leon, "I want to be honest, but I don't want to hurt myself." [*Id.* at 3:52-3:54]. However, Patterson never stopped talking to Corporal Leon or requested to end the interview. [Doc. 25 at 25]. Patterson explained why he did not open the door when officers announced themselves. [Gov't Ex. 2 at 3:55-4:18]. Patterson asked Corporal Leon how he could help, and Corporal Leon replied that he was the one who would determine what charges Patterson would face. [*Id.* at 4:58-5:03]. Patterson then asked, "What do you want me to do?" and the Corporal replied, "I want the facts, who you're buying your heroin from, who you're selling your heroin to." [*Id.* at 5:03-5:29]. Patterson then explained that a guy he used to work for stays at his house, has heroin, and he helps that guy sell it; Patterson knew

4

that this guy had been busted at his house, which was owned by Patterson's mom but occupied by Patterson for the last seven years. [*Id.* at 5:30-5:50, 6:08-7:17].

Patterson further discussed the extent of his role in selling heroin. [*Id.* at 7:18-8:49]. During the interview, Patterson's phone rang, and he looked at his phone and said, "It's my mother," and asked to answer, but Corporal Leon said that he could speak to her afterwards. [*Id.* at 7:36-7:52; *see also* Doc. 25 at 71]. Patterson expressed his conflicted feelings about helping the police but not wanting to get himself into trouble. [Gov't Ex. 2 at 5:51-5:57.]. Patterson confirmed that the phone Corporal Leon had removed from his pocket belonged to him. [*Id.* at 12:11-12:16; *see also* Doc. 25 at 72]. Patterson closed his eyes at several points during the interview. [Doc. 25 at 65].

The day after Patterson's arrest, Corporal Leon stated in an affidavit for a search warrant for Patterson's blood and urine that during the interview Patterson "appeared to avoid eye contact, appeared to be very delayed in his answers to questions, appeared to be very lethargic, and he advised he had used a syringe in his pocket which lead me to believe he was under the influence." [Doc. 25 at 64]. In describing the on-scene interview during the evidentiary hearing, Corporal Leon said that Patterson was "very serious" and said he "wasn't combative, but he wasn't happy." [*Id.* at 19]. He also described Patterson as "very groggy, a little bit," and he confirmed that he could "understood him, but he was mumbling his words." [*Id.* at

5

23]. Corporal Leon believed that Patterson was "definitely under the influence" of heroin but stated that Patterson appeared coherent. [*Id.*].

During the interview, Corporal Leon's firearm was holstered and he never removed the gun from the holster or used it to threaten Patterson. [Doc. 25 at 20]. No physical force, threats, or promises were made to Patterson. [*Id.* at 21]. Corporal Leon confirmed that he told Patterson that he could only help himself if he told the truth and that Corporal Leon would make some decisions about charging him. [*Id.* at 21, 70]. Corporal Leon did not raise his voice or yell at Patterson. [*Id.* at 23].

According to the Corporal Leon, Patterson never expressed any feelings of duress. [Doc. 25 at 24]. Patterson also never asked to speak to a lawyer. [*Id.* at 24-25]. Further, he never asked to stop talking to Corporal Leon or sought to end the interview. [*Id.* at 25]. Because he felt a good rapport with Patterson, Corporal Leon decided to cease the interview at the scene and continue it later at the jail. [*Id.*]. In total, the interview lasted just over thirteen minutes. [*Id.* at 22; Gov't Ex. 2].

Officers transported Patterson to the Bartow County Jail. [Doc. 25 at 25]. The next day, Corporal Leon continued his interview of Patterson in a private room with another agent present. [*Id.*; *see also* Gov't Ex. 3 (video of interview)]. Corporal Leon again advised Patterson of his *Miranda* rights, and Patterson acknowledged by nodding his head. [Doc. 25 at 25-26; *see also* Gov't Ex. 3 at 0:32-0:58]. Patterson

indicated he would answer Corporal Leon's questions by nodding his head. [Doc. 25 at 26; *see also* Gov't Ex. 3 at 0:58-1:01]. For the next eighteen minutes, Corporal Leon asked Patterson additional questions about the drug activity at his house and his relationship with his co-conspirator, and Patterson provided verbal or physical responses to all Corporal Leon's questions. [Gov't Ex. 3 at 1:02-19:18].

During this second interview, Patterson never asked to speak to a lawyer or asked Corporal Leon to end the interview. [Doc. 25 at 26]. At the evidentiary hearing, Corporal Leon described Patterson as "very sleepy." [*Id.* at 72]. He also noted that, likely based on his previous heroin use, Patterson appeared sick, mumbled even more than the previous day, and was yawning. [*Id.* at 72-73]. Corporal Leon also stated that Patterson arms, neck, and other body parts had visible "track marks" from heroin use. [*Id.* at 73].

On February 13, 2024, a grand jury indicted Patterson for "knowingly possess[ing] at least one visual depiction that had been shipped and transported in interstate and foreign commerce, by any means, including by computer, the production of which involved the minor engaging in sexually explicit conduct . . . in violation of [18 U.S.C. § 2252(a)(4)(B)]." [Doc. 1 at 1 (criminal indictment)]. On September 30, 2024, Patterson filed the Motion to Suppress Tangible Evidence and Statements arguing that (1) Patterson's arrest was illegal because the officers did not have a warrant and (2) Patterson did not voluntarily waive his *Miranda* rights. [Doc.

7

15]. On January 7, 2025, the Magistrate held a hearing on the Motion to Suppress Tangible Evidence. [Doc. 25]. Both Patterson and the Government field post-hearing briefs. [Doc. 27 (Patterson's brief); Doc. 28 (Government's brief)]. In his brief, Patterson conceded "that the Government's evidence forecloses a constitutional challenge to his arrest and search incident to arrest" but maintained that he did not voluntarily waive his *Miranda* rights. [Doc. 27]. On March 20, 2025, the Magistrate issued the R&R recommending that Patterson's Motion be denied. [Doc. 15]. Patterson timely filed objections to the R&R. [Doc. 33].

## II.  LEGAL STANDARD

A district judge has broad discretion to accept, reject, or modify a magistrate judge's proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 680 (1980). Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews any portion of the R&R that is the subject of a proper objection on a *de novo* basis and any non-objected portion under a "clearly erroneous" standard. "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988). Patterson has objected to the R&R, so the Court must review the objected to portions *de novo* and evaluate the remainder under the clearly erroneous standard.

### III. ANALYSIS

*Miranda* warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." *Endress v. Dugger*, 880 F.2d 1244, 1248 (11th Cir. 1989). "To determine the admissibility of a confession, courts apply a two-part inquiry: (1) whether the police complied with the requirements of *Miranda*; and (2) whether the confession was voluntary." *Arvelo v. Sec'y, Fla. Dep't of Corr.*, 687 F. App'x 901, 904 (11th Cir. 2017).

Patterson does not argue that Corporal Leon failed to provide the necessary *Miranda* warning. [Doc. 27]. Instead, Patterson only challenges the second prong of the analysis, the voluntariness of Patterson's waiver. [*Id.* at 8]. Patterson argues that the "voluntariness was undercut by intoxication, heroin sickness, and sleep deprivation—all facts known to Officer Leon—as well as Officer Leon's express promises to help Mr. Patterson with respect to charging decisions." [*Id.*].

Even if a police officer provides the necessary *Miranda* warnings, a court must still "determine if the confession was voluntary." *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994). The waiver of a defendant's *Miranda* rights must

9

(1) be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and (2) be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (citation and internal quotation marks omitted). "Among the factors [the Court] must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003).

First, Patterson's statements were "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[.]" *Moran*, 475 U.S. at 421. After viewing the videotape evidence of both interrogations, the Court initially notes that there is no evidence of "intimidation, coercion, or deception" by Corporal Leon, and nothing in the record suggests that Patterson was of low intelligence. Each interview lasted less than twenty minutes. [*See generally* Gov't Ex. 2; Gov't Ex. 3]. At no point did Corporal Leon use threats of physical violence to intimidate Patterson nor did Corporal Leon made any deceptive comments to Patterson. During the first interview, Patterson was

handcuffed, and Corporal Leon was standing over Patterson with his gun holstered, but Corporal Leon never flashed his gun in an intimidating manner during the interview or made any physical threats of violence. [Doc. 25 at 20]. Patterson acknowledges that "Officer Leon's interview was not overly aggressive, and he was not violent[.]" [Doc. 27 at 7]. Patterson never requested that Corporal Leon end the conversation. [Doc. 25 at 25]. Corporal Leon stated that he would be responsible for certain charging decision, but Corporal Leon did not state that no charges would be brought if Patterson gave information to the officer. *Compare* Doc. 25 at 21, 70 *with United States v. Lall*, 607 F.3d 1277, 1283-84 (11th Cir. 2010) (officer's assurance that he was not pursuing any charges and that defendant's statements "honesty will not hurt" him directly contradict "the *Miranda* warning that a suspect's statements can later be used against him"); *see also United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985) ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary") (citations omitted).

Second, the totality of the circumstances demonstrate that Patterson's statements were "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. It is undisputed that (1) Patterson was either under the influence of heroin or

11

experiencing symptoms of withdrawal during both interviews and (2) Corporal Leon suspected that Patterson was under the influence of heroin during both interviews. [Doc. 27 at 3; Doc. 25 at 23]. A defendant's intoxication is not, however, determinative. *United States v. Martin*, 434 F.2d 275, 277 (5th Cir. 1970) (holding that the test is whether a defendant is "intoxicated to the extent that he could not intelligently understand the warnings and could not intelligently and knowingly waive his right not to talk").[1]

Based on the video footage and the testimony of Corporal Leon, the Court finds that Patterson's intoxication did not impair his ability to comprehend the consequences of waiving his *Miranda* rights. Although visibly lethargic, his answers during both interviews were responsive to Corporal Leon's questions, rather than rambling or off-topic. [Gov't Ex. 2 at 3:22-13:22]. Patterson audibly weighed the consequences of his participation and expressed conflicting feelings about helping the police, suggesting he understood both the situation and the consequences of his statements. [*Id.* at 3:52-3:54, 5:51-5:57]. When his mother called, Patterson told Corporal Leon who was calling and asked to answer, and after Corporal Leon told him that he could speak to his mother later, Patterson promptly put the phone away. [*Id.* at 7:36-7:52]. Patterson's responsive answers during the interview do not

---

[1] The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions handed down before the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

suggest a state of stupor in which he was unaware of his surroundings or delirium in which he was unable to form rational responses to questions posed to him. Instead, he appears drowsy but otherwise able to coherently respond to questions posed to him and form reasonable assumptions about the consequences of his statements. During the jailhouse interview, Corporal Leon described Patterson as drowsy and sickly. [Doc. 25 at 72-73]. However, Patterson specifically answered questions about the drug activity at his house and his relationship with his co-conspirator. [Gov't Ex. 3 at 1:02-19:18]. After viewing the video footage and reviewing Corporal Leon's testimony, this Court was not "intoxicated to the extent that he could not intelligently understand the warnings and could not intelligently and knowingly waive his right not to talk." *Martin*, 434 F.2d at 277.

Patterson's waiver of his *Miranda* rights was "voluntary in the sense that it was the product of a free and deliberate choice" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. As the Magistrate concluded, the Defendant's Motion to Suppress is due to be denied.

## IV.  CONCLUSION

Consistent with the foregoing, the Court receives the R&R [Doc. 29] with approval and adopts its findings and legal conclusions as the Opinion of this Court.

Accordingly, the Defendant's Motion to Suppress Tangible Evidence and Statements [Doc. 15] is **DENIED**.

**IT IS SO ORDERED**, this 3rd day of February, 2026.

_____
WILLIAM M. RAY, II
United States District Court Judge
Northern District of Georgia